# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ESTACADA SCHOOL DISTRICT**, | Case No. 3:25-cv-2066-SI |
| Plaintiff-Appellant, | **OPINION AND ORDER** |
| v. | |
| **STUDENT**, | |
| Defendant-Appellee. | |

Joel E. Hungerford and Taylor A. Kinch, THE HUNGERFORD LAW FIRM, PO Box 3010, Oregon City, OR 97045. Of Attorneys for Plaintiff-Appellant.

Lara Hruska and Whitney Hill, CEDAR LAW PLLC, 600 First Avenue, Suite 330, PMB 96563, Seattle, WA 98104; and Emily Teplin Fox, FOX LAW LLC, 610 SW Alder Street, Suite 910, Portland, OR 97205. Of Attorneys for Defendant-Appellee.

**Michael H. Simon, District Judge.**

Student is enrolled in the Estacada School District (the "District"). During the Student's time at Estacada, Student exhibited developmental delay and received a diagnosis of autism. Accordingly, Student is eligible for services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.* After several incidents and disagreements related to the District's provision of services to Student during Student's kindergarten year, the 2024-2025 school year, Student's mother ("Parent") requested a due process hearing, and the case was

PAGE 1 – OPINION AND ORDER

assigned to Senior Administrative Law Judge ("ALJ") Kate Triana. The District moved for an interim order removing Student to an alternative educational placement for 45 days. After an expedited evidentiary hearing and briefing, ALJ Triana denied the District's motion in a Final Order issued on May 23, 2025. The case proceeded, and after a second evidentiary hearing, ALJ Triana issued a second Final Order on August 15, 2025, finding that the District had committed several violations of the IDEA, as well as violations of federal and state regulations. Now before the Court is the District's appeal from both Final Orders issued by the ALJ.

## STATUTORY FRAMEWORK

Congress enacted the IDEA in an effort to open the schoolhouse door for students who, before the law's passage, did not have meaningful access to a public education because of their disabilities. One of the law's primary goals is to ensure that children with disabilities are provided with a Free Appropriate Public Education ("FAPE") "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). "To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053-54 (9th Cir. 2012); *see also Endrew F. ex rel Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) ("In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children."). The "IDEA is frequently described as a model of 'cooperative federalism.' It leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer ex rel. Schaffer v. Weast*, 546

U.S. 49, 52 (2005) (quotation marks and citation omitted); *see also Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 733 (2d Cir. 2007) ("The [IDEA] requires participating states to establish a 'basic floor of meaningful, beneficial educational opportunity,' but states may exceed the federal floor and enact their own laws and regulations to guarantee a higher level of entitlement to disabled students.") As a recipient of federal funds, the Oregon Department of Education ("ODOE") must provide a FAPE to children with disabilities and must establish and maintain procedures to ensure those children and their parents are guaranteed procedural safeguards related to the provision of a FAPE. 20 U.S.C. § 1415(a).

The IDEA ensures that children with disabilities receive a FAPE by requiring that state agencies develop a detailed, individualized instruction plan known as an Individualized Education Program ("IEP") for those children. 20 U.S.C. §§ 1401(9), 1401(14), and 1414(d). The IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IEP is a written statement, prepared at a meeting of qualified representatives of the local educational agency, the child's teacher, parent(s), and, where appropriate, the child (the IEP team). The IEP, among other things, includes "the child's 'present levels of academic achievement and functional performance,' establishes measurable annual goals, addresses the services and accommodations to be provided to the child and whether the child will attend mainstream classes, and specifies the measurement tools and periodic reports that will be used to evaluate the child's progress." *Anchorage Sch. Dist.*, 689 F.3d at 1054 (quoting 20 U.S.C. § 1414(d)(1)(A)); *see also Endrew F.*, 580 U.S. at 391-92. The IEP team reviews, and if appropriate, revises, the IEP at least once each year. 20 U.S.C. § 1414(d)(4)(A)(i).

A parent may challenge the conduct of the state by filing a request for a due process hearing. 20 U.S.C. §§ 1415(b)(6), 1415(f). Such a challenge may allege a procedural or substantive violation of the IDEA. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010); *see also Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013). A procedural violation occurs when a state violates the IDEA's statutory or regulatory procedures in creating or implementing an IEP. *Id.* A substantive violation occurs when a state offers an IEP that is not reasonably calculated to enable the child to receive a meaningful educational benefit. *Id.*

When a due process complaint has been filed, "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A). Following the due process hearing, the hearing officer—here the ALJ—must provide a decision determining whether the child received a FAPE. 20 U.S.C. § 1415(f)(3)(E)(i).

When analyzing whether an agency provided a student a FAPE, the Court conducts a two-part inquiry. First, the Court considers whether the state complied with the procedures set forth in the IDEA. *Doug C.*, 720 F.3d at 1043. Second, the Court determines whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Id.* A state must meet both requirements to comply with the obligations of the IDEA. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley* ("*Rowley*"), 458 U.S. 176, 207 (1982). The Ninth Circuit has held that *Endrew* did not change, but only clarified *Rowley*. *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1200-01 (9th Cir. 2017).

A procedural violation may result in the denial of a FAPE. For that to occur, the procedural inadequacies must have: "(i) Impeded the child's right to a FAPE; (ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) Caused a deprivation of educational benefit." 34 C.F.R. § 300.513(a)(2); *see also Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) (stating that "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE" (simplified)). "A procedural error results in the denial of an educational opportunity where, absent the error, there is a strong likelihood that alternative educational possibilities for the student would have been better considered." *Doug C.*, 720 F.3d at 1047 (simplified). "[A]n IEP team's failure to properly consider an alternative educational plan can result in a lost educational opportunity even if the student cannot definitively demonstrate that his placement would have been different but for the procedural error." *Id.*

## STANDARD OF REVIEW

"When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and, 'basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. § 1415(i)(2)(C)). Courts reviewing an appeal under the IDEA do not employ the deference framework typically used in evaluating agency decisions, but must give "due weight" to the state administrative proceedings and must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. The Ninth Circuit has established that the "due weight" discussed in

*Rowley* is given only to the final decision of the state administrative authority—the hearing officer or the reviewing officer in a two-tiered administrative system (except for certain credibility determinations for which the hearing officer would retain deference instead of the reviewing officer). *See Amanda*, 267 F.3d at 887-88.

In considering the hearing officer's (here, the ALJ's) decision, a district court has discretion to decide the amount of deference it gives to the administrative findings. *See Cnty. of San Diego v. Cal. Spec. Educ. Hearing Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996). The reviewing court, however, "at a minimum, must consider the findings carefully." *R.B.*, 496 F.3d at 937 (simplified). The district court also gives "particular deference where the hearing officer's administrative findings are 'thorough and careful.'" *Id.* (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). A reviewing court also gives deference to the hearing officer's credibility determinations of live witnesses. *See Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1127 (9th Cir. 2003) ("Normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding."); *Amanda J.*, 267 F.3d at 889 (recognizing that "a HO [hearing officer] who receives live testimony is in the best position to determine issues of credibility").

## BACKGROUND[1]

Student attends school in Estacada School District 108. Student was born in 2018, and lives in Estacada with Student's family, including two older siblings. Ex. S34 at 1. At all relevant

---

[1] The ALJ made thorough findings of fact in both her Final Order of May 23, 2025, on the expedited matter, and her Final Order of August 15, 2025. The Court does not duplicate here the detailed narrative timeline that ALJ Triana created below but rather includes only the most salient points and overall themes from the record.

The District characterizes the following facts found by ALJ Triana as inaccurate or incomplete: 2, 3, 7, 8, 9, 10, 11, 12, 13, 17, 18, 23, 27, 31, 36, 40, 41, 58, 63, 83, 101, 103, 105, 107, 108, 118, 137, 138. 139, 143, 168, 194, 214, 215, 229, 232, 251, 269, 276, 279-80, 286-87,

times, Student has been "small for [Student's] age"—so much so that Student's doctors have expressed concern about Student's size. *See*. Ex. D4 at 1. At the administrative hearing on the District's Motion for a 45-day Interim Alternative Education Setting ("IAES"), Parent testified that Student is three to three-and-a-half feet tall and weighs 39 pounds, which is in the 11th percentile. Transcript of Expedited Hearing ("Exp. Tr.") 659:25-660:8. Before entering kindergarten, Student attended a private daycare, but the daycare ultimately referred Student's parents to Clackamas Education Service District ("CESD") for services related to Student's behavioral issues, including "throwing chairs and dumping materials onto floor, punching, slapping, kicking, spitting on, pinching and biting Teachers," among other problems. Ex. D4 at 1. On evaluating Student, CESD noted that Student had difficulty with transitions, that Student's adaptive, social, and emotional skills were delayed and cognitive skills were somewhat delayed. *Id*. at 1-8. Thus, Student was deemed eligible for Early Childhood Special Education ("ECSE") services based on developmental delay. *Id*. at 8.

On March 8, 2024, CESD convened a meeting to develop and adopt an Individualized Family Service Plan ("IFSP") for Student, intended to guide services for Student until Student entered kindergarten. Ex. D6 at 1.[2] Through CESD, Student enrolled at Gladstone Early Education ("Gladstone"), where Student appeared to progress toward Student's IFSP goals.

---

289-90, 292-301. *See* Compl. ¶ 15. The Court has reviewed both the record and the ALJ's Final Orders and finds the ALJ's factual findings to be an accurate reflection of the record.

[2] The IFSP called for Student to attend community preschool for 29 hours per week. D6 at 1. It also provided that Student receive 0.81 hours per week of ECSE services, including thrice monthly 45-minute sessions of specialized instruction in cognitive, adaptive, and social skills in the classroom and thrice monthly 45-minute sessions of family training activities in the home. *Id*. Finally, Student was to receive specific sensory and other supports to assist with transitions and classroom routines. *Id*. at 3. The IFSP team also set several goals for Student, notably focused on attending to activities in the classroom, independently transitioning between activities, and resolving conflicts with peers. *Id*. at 8.

Student's mother noted that Student "learned self-regulation tools and grew in [Student's] capacity to handle transitions, big emotions, and interactions with peers." Ex. S6 at 2. Contemporaneous CESD reports affirmed that assessment, indicating that Student met some of Student's IFSP goals and made meaningful progress towards meeting others, though this progress was not without notable examples of regression to unwanted behaviors. *Id*. at 29-35.

In anticipation of Student's enrollment in kindergarten for the 2024-2025 school year, the District convened an IEP meeting on May 30, 2024. Exs. D8 at 1; D9 at 1. Ahead of the meeting, the District's student services instructional coach, Stephanie Peterson, and learning specialist, Katherine Zeis, created a draft IEP for the IEP team's consideration, relying heavily on Student's IFSP and information gathered from staff at Gladstone. Due Process Hearing Transcript ("Tr.") 23:10-25:8. At the meeting, the IEP team discussed Student's strengths and weaknesses, including that Student could be a "sweet, good, loving little [child] when [Student] wants to be," and that Student could also be very verbally and physically aggressive. Exs. D10 at 4; D12 at 1.

The resulting IEP noted no concerns with Student's academic achievement, but identified several areas of concern with respect to Student's social, emotional, and behavioral development. Ex. D10 at 4-5. Student's mother expressed concerns as to whether the District could handle Student's behaviors, especially Student's tendency towards verbal and physical aggression, destruction of property, and elopement, in a traditional classroom. Tr. 26:25-27:20. The team weighed those concerns against the value of placing Student in the Least Restrictive Environment ("LRE"). *Id*. Ultimately, they determined to place Student in the general education classroom with "push-in" and "pull-out" support. Ex. D10 at 14-15.

The IEP included two goals for Student for the school year. The first, in "social/emotional – behavior," was:

PAGE 8 – OPINION AND ORDER

> Given a social scenario and an emotion visual, [Student] will
> identify a possible feeling of the individual in the scenario and a
> possible self-regulation activity they could implement with 80%
> accuracy in 3 out of 4 opportunities by spring 2025.

*Id*. at 8.  The second, in the area of self-management, was:

> Given verbal, tactile and/or visual cues during a transition time,
> [Student] will transition to the next activity within 1 minute of the
> given direction in 3 out of 4 opportunities by [spring 2025].

*Id*. at 9.

Further, the IEP provided for the following services and supports:

- 30 minutes weekly of Specially Designed Instruction ("SDI") in the area of behavior—social/emotional. *Id*. at 10.

- 30 minutes weekly of SDI in self-management. *Id*.

- Making adult assistance available to help deal with safety and elopement concerns, transitions, self-regulation, and toileting. *Id*.

- Access to sensory supports (a preferred object) during transitions. *Id*. at 10-11.

- Transition supports, including 5/2/1 warnings before transitions, visual and verbal cues, timers, and first-then language. *Id*. at 11.

- Visual supports, including schedules, routines, expectations, directions, and self-regulation support. *Id*.

- Options for in-class or out-of-class breaks with adult support to deal with dysregulation. *Id*.

The team considered, but did not add, a Behavioral Support Plan ("BSP"),[3] though it agreed to monitor Student's behavior once the school year began for signs that a BSP needed to be developed. Ex. D12 at 1.

---

[3] The IDEA and Oregon regulations reference "behavioral intervention plan." *See, e.g.*, 20 U.S.C. § 1415(k)(1)(F); OAR 581-015-2415(4)(b)(B). The ALJ and the parties, however, use "behavior support plan," and thus the Court uses that term in this Opinion and Order.

Almost immediately upon the beginning of classes, Student began engaging in unwanted behaviors. These included inappropriate language, verbal and physical aggression towards staff and peers, and elopement.[4] *See, e.g.*, Ex. D53. These behaviors would continue throughout the school year to varying degrees of frequency and intensity. On September 6, 2024, after Student punched a teacher and engaged in other unwanted behaviors, Student was sent to the principal's office, where the assistant principal made a call to Student's mother. Ex. D53 at 1; Tr. at 10:7-15.

Student's mother was alarmed at how quickly the District resorted to removing Student from the classroom as a means of managing Student's behavior. *See* Ex. S11 at 1. Thus, later on September 6th, she emailed the District, requesting that the District perform a Functional Behavioral Assessment ("FBA") for Student, expressing her strong belief "that not understanding some of the reasons behind [Student's] behaviors, is impeding an appropriate action plan that will set [Student] up for success within the Estacada School District." *Id*. On September 13th, Student's father signed the consent form allowing the District to proceed with the FBA. Ex. D14 at 1. The District subsequently assigned the task of completing the FBA to Ms. Abby Williams, the school psychologist. Tr. at 85:13-15. Ms. Williams observed Student for roughly one week in multiple school settings, and obtained information from Student's teachers, parents, paraeducators, and from Student himself. Exp. Tr. 204:1-206:3. Based on these efforts, Ms. Williams identified lagging skills in managing irritability and emotions, thinking before

---

[4] Elopement is when a student leaves the regular classroom without the permission or supervision of a staff member. Throughout the school year, Student regularly would elope from the classroom. A child who elopes to a location inside the school building can hide from staff, access items that could create a safety hazard for the child, and complicate evacuation efforts in the event of an emergency. A child who elopes to locations outside the school building can quickly find themselves in a dangerous environment if the child runs into traffic or off of campus grounds. *See* Exp. Tr. 229:21-230:22.

acting, and understanding how Student's behaviors affect others as the function of Student's behavior. Ex. D16 at 3.

On September 24, 2025, Student's IEP team convened another meeting to discuss the FBA and create a BSP. *See* Ex. D17. During the meeting, Student's mother expressed concerns that Student needed a "1:1"[5] to address Student's behaviors and prevent elopement, noting that Student's success at Gladstone stemmed in part from a higher level of adult support. *Id*. at 1. The resulting BSP did not include 1:1 support, but did include a range of other interventions and strategies, notably including the incorporation of art into classwork,[6] providing access to snacks and breakfast, redirecting inappropriate comments, sensory supports, stop signs at exit doors, teaching replacement words for inappropriate language, teaching zones of regulation, transition support, providing an alternate location for breaks (or, if eloping, for classwork), and providing an alternate location with snacks and art to help Student regulate when escalated.[7] Ex. D16 at 4-5. The BSP also noted that Student's older siblings could be helpful in calming Student down. *Id*. at 5. In the immediate aftermath of the implementation of the BSP, Student's improper behavior continued. Over the next month, Student continued to use inappropriate language, engage in inappropriate physical behaviors, and elope from the classroom. *See, e.g.*, Exs. D53, D55.

---

[5] When a student receives 1:1 support, that means that there is an adult in the classroom assigned to focus exclusively on that student.

[6] Student enjoys art and building things, so this strategy was intended to "include [Student's] interests in [Student's] learning." Ex. D16 at 4.

[7] The District maintained a classroom designated as "LC1," or "learning center 1," which was set aside to accommodate children who needed a sensory break, quiet time, or other period of separation from the regular classroom. Exp. Tr. 77:16-78:5. As the school year progressed, Student would spend more and more time in LC1 for a wide variety of reasons.

On October 23rd, the IEP team held another meeting, this time to review and amend Student's IEP. Exs. D18; D19; D21. The team discussed Student's escalating behavior. Student's mother raised the possibility of half-day kindergarten and expressed concern that the IEP form's inclusion of the full range of placement options seemed to be laying the groundwork to send Student to an alternative school. Ex. D21 at 1; Ex. D19 at 15-16. District staff reassured her that they strove to educate Student in the LRE and that they were required to include the full range of placement options on the IEP form. Ex. D21 at 1. The IEP team ultimately made the following material changes to Student's IEP:

- SDI for social and emotional behavior increased to 60 minutes per week. Ex. D19 at 11.

- SDI for self-management increased to 60 minutes per week. *Id.*

- 60 minutes per week of SDI for transitions was added. *Id.*

- IEP was amended to provide adult support "throughout [Student's] entire day to support safety, transitions, and self-regulation." *Id.* Importantly, this did not mean that Student was assigned a specific adult to support Student's needs. Rather, the support was intended to be "fluid" depending on what personnel were available. *See* Ex. D21 at 1.

- Student's BSP was added to the IEP. Ex. D19 at 12.

- Student's level of participation in the general education classroom was adjusted down to 40% of Student's school day. *Id.* at 13, 16.

Student's behavioral, emotional, and social challenges continued after the October 23rd IEP meeting despite the new supports and the implementation of the BSP, culminating on November 6th. On that date, which included a peak of 37 instances of inappropriate physical behaviors, Student "began pushing over chairs and other items/furniture," and hit staff when they intervened. Ex. D25 at 1. Student spanked a fellow student and called other students names. *Id.* When assistant principal Trevor Syring arrived to support, Student hit, kicked, and threw items at him. *Id.* District staff ultimately called Student's mother, and sent Student home early. *Id.*

On December 2, 2024, the IEP team met for a Manifestation Determination Review

PAGE 12 – OPINION AND ORDER

("MDR") focusing on the November 6th incident and the fact that Student had been suspended six times so far that school year.[8] *See* Ex. D25; Ex. D26 at 1. The team determined that Student's conduct was a manifestation of Student's disability. Ex. D25 at 1-2. District staff determined that the incident was not the result of any failure to implement Student's IEP, but Student's mother disagreed, arguing that Student was not receiving the support Student needed. Ex. D26 at 1. In particular, she stated her belief that staff were inadequately trained or available and that Student was inadequately supported during transitions. *Id*. Importantly, the full team agreed that "everything we are trying is not decreasing [Student's] behaviors," resulting in safety risks both for Student and others, as well as Student's needs not being met. *Id*. at 1-2. District staff also expressed concern that Student was falling behind academically because of the amount of time Student spent outside the classroom. *Id*. at 2. Consequently, District staff raised the issue of changing Student's placement, recommending that Student be sent to an alternative school. *Id*. Student's mother protested that the team had not gathered sufficient data to make such a determination, and speculated that the District's practice of rotating the adult available to support Student created unhelpful unpredictability. *Id*. One team member, Ms. Lacy Norvald, shared her observation that "in her years of experience she has never seen as many resources brought in on a student, but . . . still not changing behavior." *Id*. Ultimately, the District delayed its recommendation of an alternative school placement so that Student's mother could investigate the possibility of moving Student into the Gladstone School District. *Id*. at 2-3.

Four days later, on December 6th, Student's parents emailed the District. Ex. S13 at 1-2. In the email, they criticized the lack of a dedicated, full-time paraeducator to support Student and

---

[8] Student was out of school for most of November due to a combination of holidays and injury, accounting for the significant delay between the November 6th incident and the December 2nd meeting.

protested the recommendation to move Student to an alternative school so soon after the implementation of Student's BSP. *Id*. They requested both a "thorough and impartial review of all actions undertaken since the BSP's implementation," as well as an Independent Educational Evaluation ("IEE") to create a more effective IEP. *Id*. The District declined to offer an IEE because, they argued, the District was not responsible for conducting an IEE when the underlying initial eligibility evaluation was conducted by a different organization, CESD. *Id*. at 1. They did, however, offer to move up Student's three-year re-evaluation, which had been scheduled for 2026. *Id*. They also followed up by sending a Prior Notice of Special Education Action to Student's parents, summarizing the December 2nd meeting and noting that the team had agreed to put discussion of the District's recommended change of placement on hold for a week. Ex. D27 at 1.

For the next two months, Student's unwanted behaviors continued relatively unabated, fluctuating modestly but showing little sign of sustained improvement. Inappropriate language, destruction of school property, physical aggression, and elopement continued to be hallmarks. *See, e.g.*, Ex. D53, D55. This included multiple instances of hitting teachers and peers, as well as an incident on January 8, 2025, when Student threatened to go home to retrieve a sibling's gun, then return and shoot peers and staff. *Id*.

On February 5, 2025, the IEP team convened yet another meeting, this time virtually. *See* Exs. D30; D31. Unlike previous meetings, this one included an IEP facilitator from ODOE, Ms. Robin Day. Exs. D30; D37 at 1. The purpose of the meeting was to determine the need for any additional testing, review Student's IEP, and conduct an MDR. Ex. D28. Importantly, though, the meeting also served as an opportunity to discuss an ongoing source of confusion for Student's mother: the District's suspension policies. *See* Ex. D30 at 2-3. As discussed above,

PAGE 14 – OPINION AND ORDER

Student routinely was suspended from school, sent to the principal's office, or sent home from school for behavior. But it was not clear to Student's parents when a removal from class constituted a suspension. *See* Tr. 692:15-694:8 (explaining that Student's mother did not know that the District was counting certain removals as suspensions until the effort to schedule an MDR in early November 2025). District staff explained that there was no black or white rule as to when a suspension should occur, but that any time a child is sent home, the District considers it a suspension. Ex. D30 at 2. If Student is sent home after 11:00, it is considered a half-day suspension. *Id*.

The rest of the meeting focused on the implementation of Student's BSP. The team discussed the inadequacy of data collection on Student's behavioral incidents to that point in the school year and discovered that important pieces of information were not effectively communicated to Student's parents. *Id*. at 3-5. District staff noted that October had been a difficult month, and that Student's behavior had improved "in some areas" since that time due to an increase in adult support. *Id*. at 4. The team subsequently revised Student's data tracking sheet with the intent of updating Student's BSP based on the improved data collection. *See* Ex. D34. Student's mother put her request for an IEE "on hold" provided the team continued to work on improving the BSP. *Id*. Notably, the District agreed to begin exploring assessments to reevaluate Student for services under the eligibility category of Autism Spectrum Disorder ("ASD"). *Id*. Changes to Student's BSP were approved on February 18th, and included additional reminders and structure throughout the day, including a structured recess. Ex. D35.

The team met again for an IEP meeting on February 27th, where they agreed to re-evaluate Student based developmental disability, ASD, and emotional or behavioral disorder

PAGE 15 – OPINION AND ORDER

("EBD"). Ex. D37; *see also* Ex. D38 at 3-4 (listing the proposed tests and assessments for Student's re-evaluation).

Student continued to struggle with the same behavioral challenges for the remainder of the school year. The District convened MDRs in response to suspensions on at least six occasions.

- On March 3rd, Student was suspended for punching other students, refusing to follow the instructions of District staff, and eloping from the elementary school grounds. Ex. D39.

- On March 5th, Student was suspended for entering the assistant principal's office to retrieve Student's confiscated cell phone, using inappropriate language, and striking the paraprofessional who was supporting Student while searching for the phone. Ex. D42.

- On March 12th, Student was suspended for hitting a fellow student in the ear and then running from the assistant principal when asked about the incident. Ex. D49.

- On April 15th, Student was suspended for an extended elopement wherein Student hid from District staff, as well as for refusing to complete schoolwork, kicking a door, and punching a paraeducator in the arm, stomach, and leg. Ex. D78.

- On May 8th, Student was suspended for inappropriate language, eloping from Student's classroom, and threatening and hitting two staff members. Ex. D88.

- On May 29th, Student was suspended for eloping from the classroom, refusing to do classwork, inappropriate language, throwing and destroying school property, hitting one staff member, and trying to hit a second staff member. Ex. D96.

On all these occasions, the team determined that Student's conduct was not the result of the District's failure to implement Student's IEP, and that it was a manifestation of Student's disability. *See* Exs. D39, D42, D49, D78, D88, D96. As with earlier in the school year, these suspensions did not reflect the full breadth of Student's challenges. Student continued to frequently use inappropriate language towards both classmates and District staff, throw items, vandalize or destroy property, elope from the classroom, and refuse classwork. Student's comments were often alarming. On February 6th, Student told a peer that Student was "going to kill your parents and your dog." Ex. D61 at 1. Sometime between February 18th and 21st,

PAGE 16 – OPINION AND ORDER

Student made comments about shooting using a sibling's gun. Ex. D53 at 9. On March 6th, Student threatened to send Student's class "to heaven." *Id*. at 10. On March 20th, Student told a paraprofessional: "I'll kill you." Ex. D62 at 1. On April 3rd, Student stated that Student "want[ed] to kill [Student] at school," Ex. D57, and on April 8th, Student pondered "crack[ing]" Student's head open because Student "[didn't] want to live anymore." Ex. D58 at 1. On April 9th, Student wrote a poem that included statements that Student wanted to "grab a knife and grab my shotgun and I shoot everyone. Then you lock the doors. Then you see the monsters chasing you. Then you grab the RPG." Ex. D63. On April 15th, when Student was supposed to be "cutting out leaves" for a class project, Student instead cut out a paper pistol and began "shooting" at other students." Ex. D64. On May 8th, Student told the assistant principal to kill himself. Ex. D88. From the record evidence, it appears that both District staff and Student's parents saw these comments as in keeping with Student's other inappropriate language, rather than indicative of any genuine intent to seriously harm himself or others.

Amidst these ongoing challenges, Student's parents and District staff continued to wrestle with how best to meet Student's needs, with the prospect of placement in an alternative school increasingly the source of disagreement between the two groups. On March 13th, the District convened another IEP meeting in part to discuss Student's placement, as well as potentially shortening Student's school day, though Student's mother was not clearly informed that the meeting would include discussion of an alternative school. Ex. D45; Ex. D47. Student's mother sent an email to the District ahead of the meeting expressing concern that the meeting was premature because it was being held while Student's re-evaluation and attendant assessments, for which she had signed consent forms only ten days prior, were ongoing. Ex. D47 at 1-2. She

PAGE 17 – OPINION AND ORDER

expressed concern that shortening Student's school day might undermine the ongoing tests and requested that the District proceed with an IEE for Student's FBA. *Id*.

At the meeting, District staff raised again the possibility of changing Student's placement "because the school team has implemented a robust plan to support [Student] and we are still seeing unsafe behaviors and behaviors that are affecting other students." *Id*. at 4. District staff emphasized that they were a traditional school without the resources to create the specialized or therapeutic setting that they believed Student needed. *Id*. at 4-6. They discussed other alternatives, like homeschool or removing Student from the regular classroom 100 percent of the time but noted that Student was regressing in Student's academic skills because Student was getting less direct instruction from Student's teachers. *Id*. at 5. Student's mother expressed frustration that she had not been given a Prior Written Notice ("PWN") that the IEP meeting was intended to focus on the prospect of sending Student to an alternative school. *Id*. District staff informed her that PWNs typically are issued after IEP meetings but before any decisions are implemented, an assertion with which Student's mother disagreed. *Id*. Student's mother then stated that she was effectively an observer, rather than a participant, at the meeting until such time as she could get an attorney. *Id*. Despite this, the IEP team ultimately determined to place Student at an alternative school, and to shorten Student's school day until Student could get a seat at such a school. *Id*; *see also* Ex. D48. Student's mother then stated again that she would be contacting a lawyer and initiating a due process hearing, and she invoked Student's "stay put" rights.[9] Ex. D47 at 6.

---

[9] "Stay put 'functions as an "automatic" preliminary injunction' in IDEA cases by prohibiting changes to a student's educational placement until the legal dispute is resolved. Because the injunction is automatic, a student who requests an administrative due process hearing is entitled to remain in his educational placement regardless of the strength of his case or the likelihood he will be harmed by a change in placement." *A.D. ex rel. L.D. v. Hawaii Dep't of*

PAGE 18 – OPINION AND ORDER

The following day, Student's mother emailed the District reiterating that she did not consent to placing Student in an alternative school, stating that the District's attempt to do so before completing Student's re-evaluation was unlawful under 34 C.F.R. § 300.304. Ex. S18. She took issue with District staff's past comments that they did not have the personnel to assign a single paraeducator to Support student on a permanent basis, characterizing those statements as excuses and accusing the District of not tackling the problem "head-on." *Id*. She further accused the District of violating statutes and regulations regarding FAPE, LRE, parental consent, and failure to respond to her request for an IEE, and once again invoked "stay put" rights. *Id*.

On April 11th, the District convened an IEP meeting, during which the IEP team determined that Student had made progress on Student's IEP goals and adjusted the goals accordingly. Ex. D75 at 4. They also determined that, given this progress, Student did not require extended school year ("ESY") services. *Id*. at 5.

Beginning April 17, 2025, the District assigned Mr. Kyle Gilstad to be Student's primary paraprofessional, working with Student for most of the day save a two hour period around lunch. Exp. Tr. 592:3-10, 614:20-615:1. The consistency appeared to make an impact, with Student's maladaptive behaviors continuing but noticeably decreasing. *Id.* 608:20-25; 615:8-618:25. Still, despite these modest improvements, Student still engaged in unwanted behaviors, sometimes leading to the aforementioned suspensions and MDRs. Additionally, Student resisted engaging with the general education classroom, and Mr. Gilstad expressed concern that he could not keep other children safe when Student was around. *Id*. 623:1-13.

---

*Educ.*, 727 F.3d 911, 914 (9th Cir. 2013) (quoting *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1037 (9th Cir. 2009)).

At the April 22nd MDR reviewing the April 15th incident, Student's mother again requested that the District dedicate a single, full-time paraprofessional to provide Student 1:1 support. Ex. D79 at 1. The District declined, opting to assign two paraprofessionals to rotate responsibilities with Student. *Id*. In response to a request from Student's mother, the District also indicated that it was in the process of contracting with a Board Certified Behavior Analyst ("BCBA") to review Student's FBA and BSP. *Id*.

Beginning April 23rd, the District began providing make-up SDI time to Student due to Student's lost SDI time during Student's suspensions. Ex. D102; Tr. 162:21-171:5. The District delivered this make-up time in eight different sessions over the course of late April and May, totaling 420 minutes of make-up time. Ex. D102 at 1.

On May 27th, the District convened the final IEP meeting of the year. Notably, Ms. Zeis shared that Student was spending only 20 percent of Student's time in the general education classroom, with much of the rest in LC1, and that Student often was not engaging with schoolwork. Ex. D92 at 3. The team discussed Student's unwanted behaviors, prompting Student's parents' attorney to argue that the District's pattern of suspending Student for those behaviors was making the behaviors worse. *Id*. at 14. The team also discussed Student's placement, but Parents' attorney argued that the discussion was not useful because the District had already predetermined Students' placement. *Id*. District staff disagreed that they had predetermined Students' placement. *Id*. Student's mother also related her impression from a visit to Heron Creek, the therapeutic school that appeared to be the District's preferred placement for Student. She described an environment with very little structure and peers that were "severely disabled," which the Court understands to mean that the children she saw there did not appear to

be on the same cognitive level as Student.[10] Ex. D92 at 14. The team also added a previous email from Student's mother to the parent input section of the IEP. In the email, Student's mother informed the District that Student had received a formal autism diagnosis on April 29th. Ex. D91 at 4-5. She also requested that Dr. Maria Gilmour, a PhD-level BCBA, be allowed to develop a new FBA and BSP for Student and requested ESY services. *Id*. The school did not grant either request. The school year ended on June 12, 2025. Ex. D74 at 12.

## PROCEDURAL HISTORY

On March 19, 2025, Parent filed a request for a due process hearing with the Oregon State Superintendent of Public Instruction, initiating an administrative case against the District. Parent alleged that the District violated federal and state statutes, federal regulations, and state administrative rules. Parent raised seven primary errors, usually with subsets of alleged errors within most categories. ODOE referred the matter to the Office of Administrative Hearings, who assigned ALJ Triana.

On April 4, 2025, the District filed a Motion seeking an order from the ALJ for a 45-Day IAES to send Student to an alternative school—Heron Creek or Serendipity Center. The District's motion was under Oregon law, invoking the Oregon Administrative Rules ("OARs"). ALJ Triana held an expedited videoconference hearing on the Motion from April 30th to May 2nd. Both parties were represented by counsel. ALJ Triana heard testimony from 11 witnesses. She issued a Final Order on May 23rd denying the Motion ("Expedited Order"). ALJ Triana concluded that the District failed to show that Student was substantially likely to engage in

---

[10] It is not clear at what point in the school year Heron Creek became an option under discussion as a possible placement for Student; however, by March 2025, Student's mother was reaching out to Heron Creek staff to ask about their program. Exp. Tr. 638:17-639:20. The other therapeutic school under consideration was Serendipity Center. Exp. Tr. at 101:14-21.

injurious behavior "to Student or others if Student remains in Student's current placement" under OAR 581-015-2445(1)(b). *See* Expedited Order at 39-40. She also concluded that the District failed to show that the alternative placing met the requirements of OAR 581-015-2430(3), to comply with OAR 581-015-2435(2) and ensure that Student would continue to participate in Student's general curriculum and progress toward achieving the goals in Student's IEP. *Id.* at 41-42.

ALJ Triana presided over the due process videoconference hearing from June 10-12 and on June 26th. Both parties were again represented by counsel. ALJ Triana heard testimony from 10 witnesses. She issued a Final Order on August 15, 2025. She found the following violations:

- The District denied Student a FAPE from January 28th to May 12th by failing to deliver all of Student's SDI while Student was suspended.

- The District denied Student a FAPE from January 28th to May 12th when it improperly changed Student's placement by imposing more than ten cumulative days of disciplinary removal in violation of OAR 581-015-2415.

- The Student's BSP was inappropriate and failed to provide a FAPE starting on December 2, 2024.

- The District denied Student a FAPE when, in March, it changed Student's placement to a therapeutic day school instead of considering additional supports and services to maintain Student in the LRE.

- The District denied Student a FAPE from December 2nd to May 12th by failing either to conduct a new FBA or review and modify student's BSP following the December 2nd MDR.

The ALJ ordered to remedy these violations that the District hire an independent behavioral specialist with experience conducting FBAs for students in a school-setting to conduct a new FBA; convene an independently facilitated IEP meeting, including the behavioral specialist, to develop a new BSP and IEP and to determine Student's placement; and provide 200 hours of compensatory education, 60 hours of which must include SDI and related services.

PAGE 22 – OPINION AND ORDER

The District appeals to this Court all violations found by the ALJ in both Final Orders. The District also appeals the remedy ordered by the ALJ.

## DISCUSSION

### A. Deference

As discussed above, the courts give "particular deference where the hearing officer's administrative findings are 'thorough and careful.'" *R.B.*, 496 F.3d at 937 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). Here, both of the ALJ's Final Orders are extremely thorough, evincing a careful effort to synthesize and weigh a voluminous administrative record and lengthy testimony. Though the District argues several times in its various filings that the ALJ's findings and conclusions are internally inconsistent, the Court finds that those arguments generally are based on the District's misunderstandings of various ALJ findings, not any logical inconsistency on the ALJ's part. Thus, the Court gives the ALJ's findings and conclusions not just due weight but particular deference.

### B. ALJ's Final Order on the District's Motion for a 45-Day IAES

The District appeals the ALJ's Final Order on the District's Motion for a 45-Day IAES (the "Expedited Order"). The District argues that the ALJ erred by applying the wrong legal standard and in her finding that the District failed to provide evidence that their proposed placement would meet Student's needs. Each alleged error is addressed in turn.

#### 1. The ALJ applied the correct legal standard to District's motion

The District sought to place Student in an IAES for 45 days while these proceedings and possible appeals were ongoing. During any IDEA proceeding, absent agreement, "the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). This is known as the "stay put" provision. A school district may, however, place a student in an alternative setting for no more than 45 days under certain special circumstances, involving

PAGE 23 – OPINION AND ORDER

weapons, drugs, and the infliction of serious bodily injury. *Id.* § 1415(k)(1)(G); *see also*

OAR 581-015-2360(5)(a)(C). A district also may request that an ALJ order such a placement,

which requires that the ALJ "determine[] that maintaining the current placement of such child is

substantially likely to result in injury to the child or to others." 20 U.S.C. § 1415(k)(3)(B)(ii)(II);

*see also* OAR 581-015-2360(5)(a)(D) (providing that the ALJ may order such placement "due to

the substantial likelihood of injurious behavior"). Meeting one of those exceptions is a high bar,

as the stay-put provision "effectively creates a presumption in favor of the child's current

educational placement." *Honig v. Doe*, 484 U.S. 305, 328 (1988).

Here, the District moved for an order under Oregon's regulation, which allows the ALJ to

order placement after finding a substantial likelihood of "injurious behavior." OAR 581-015-

2360(5)(a)(D). "'Injurious behavior' means behavior that is substantially likely to result in injury

to the child or others," OAR 581-015-2430(1), which is text directly from the federal statute

allowing for ALJ placement.

In her Expedited Order, ALJ Triana noted that Oregon law does not further define what

amounts to an injury but explained that it must be different from and less severe than the

separately defined term "serious bodily injury."[11] Expedited Order at 39. She considered the

decisions of three other ALJs ruling under § 1415(k)(3)(B)(ii). Those decisions do not apply a

consistent rule.[12] Ultimately, the ALJ found that Student had engaged in unsafe and potentially

---

[11] Oregon law defines "serious bodily injury" as "any significant impairment of the physical condition of a person, as determined by qualified medical personnel, whether self-inflicted or inflicted by someone else." Or. Rev. Stat. § 339.285(4). Under the IDEA, it is defined as bodily injury that involves "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty[.]" 18 U.S.C. § 1365(h)(3); *see also* 20 U.S.C. § 1415(k)(7)(D) (referencing that criminal provision for the applicable definition).

[12] *Compare Corona-Norco Unified Sch. Dist.*, 125 LRP 4096 (2025) (finding a 7-year-old with emotional disability and other health impairments substantially likely to cause injury when

PAGE 24 – OPINION AND ORDER

injurious behavior throughout the preceding school year and likely would continue to do so. But ALJ Triana ultimately did not hold that the District had shown a *substantial likelihood* of future injurious behavior in large part because Student's past behavior had not resulted in any injuries. In other words, although Student's *conduct* had been unsafe and would likely continue to be so, the *result* of that conduct had not been injurious and thus it is not *substantially likely* that it would suddenly become injurious.

The District argues that in reaching this conclusion, the ALJ applied an arbitrarily high standard fundamentally at odds with the law. *See* Appellant's Brief at 9-10 (ECF 8). The District argues that the ALJ essentially required the District to show that Student had previously caused actual injury to himself or others. *Id*. at 12-15. That is not what the ALJ did. Rather, she stated that past behavior was a good predictor of future behavior. Over the previous school year, District staff had been able to prevent Student's *potentially* injurious behavior from escalating into actual injury, and the ALJ thus concluded that the continued normal intervention by District staff would prevent Student's future behavior from escalating into injury.[13]

---

the child repeatedly stabbed staff member with pencil, assaulted peers and staff, and threatened to "shoot" or "kill everyone" even after six MDRs, 18 suspensions, and IEP and BSP revisions) *with Saddleback Valley Unified Sch. Dist.*, 52 IDELR 56 (2009) (declining to find that a 13-year-old was substantially likely to cause injury after he threatened peers, even though the child had a history of IAES placement due to injurious behavior, because of evidence that the child's self-control had improved).

[13] The Court agrees with the ALJ's interpretation of OAR 581-015-2360(5)(a)(D). Although that regulation describes only "injurious behavior" without reference to downstream effects OAR 581-015-2430(1)'s definition of injurious behavior provides the needed clarity. It limits "injurious behavior" only to include behavior that is substantially likely *to result in* injury. In combination, these provisions comport with the IDEA's requirements in 20 U.S.C. § 1415(k)(3)(B)(ii)(II). Thus, if routine intervention is likely to prevent an injury stemming from a child's potentially injurious behavior, then a temporary change in placement would not be permitted.

PAGE 25 – OPINION AND ORDER

The ALJ noted that the District had provided no evidence to show that circumstances had changed such that there would be any expectation of different behavior by Student in the future to give rise to a concern of injury. That is to say, the District was arguing that a different result would occur from the same type of conduct by the same child. The ALJ rejected this as insufficient to show a substantial likelihood of injury. The Court agrees. Nowhere in the record does the District show that Student's behavior has become or is likely to become more dangerous. For example, the District does not contend that Student has grown substantially in size or strength, brought weapons to school, or adopted new tactics more likely to result in injury. If Student's behavior is likely to remain substantially the same, and that behavior has not resulted in injury in the past, then it is difficult to see how the District has shown a future substantial likelihood of injury. Therefore, the District fails to overcome the presumption in favor of keeping Student in place during the pendency of due process hearings and appeals.

The District also contests the ALJ's discussion of whether the District showed that it had taken reasonable steps to minimize Student's risk of causing injury before pursuing an IAES, despite the ALJ's conclusion that the District had successfully made such a showing.[14] As a

---

[14] The District rightly points out that Oregon regulations do not require such a showing in support of an IAES. The ALJ discussed a non-precedential decision from the Eighth Circuit, *Light v. Parkway C-2 Sch. Dist.*, which included the "reasonable steps" requirement as an inquiry necessary "to ensure that the school district fulfills its responsibility under the IDEA to make available a 'free appropriate public education . . . for all handicapped children . . . .'" 41 F.3d 1223, 1228 (1994). The court noted 20 U.S.C. § 1412(5)(B)'s requirement that removal of handicapped children from the regular educational environment was only permissible when "education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." It then justified the reasonable steps test on the grounds that "a district court should be satisfied that the school district has made reasonable use of 'supplementary aids and services' to control the child's propensity to inflict injury." *Light*, 41 F.3d at 1228.

The ALJ then acknowledged that no such test existed in Oregon. Indeed, the Ninth Circuit has not adopted the reasonable steps test. But, she explained, "[w]ithout a standard requiring that a school district take reasonable steps to minimize the likelihood that a student

general rule, "[a] prevailing party usually may not appeal a decision in its favor." *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 520 (9th Cir. 1999). Thus, the Court will not entertain the District's arguments about the ALJ's finding that the District took reasonable steps to minimize Student's risk of causing injury.

### 2. The District did not provide adequate evidence that IAES would meet Student's needs

To obtain an order from an ALJ to change a child's placement to an IAES, the IAES "must meet the requirements of OAR 581-015-2435(2)." OAR 581-015-2430(3). That regulation requires that the IAES "[e]nable the child to: (a) Continue to participate in the general curriculum, although in another setting; and (b) Progress toward achieving the goals in the child's IEP." OAR 581-015-2435(2). Here, the ALJ found that the District provided limited evidence about the programming available at Heron Creek. This evidence included some testimony at the administrative hearing and a copy of the Heron Creek handbook. But the District "failed to provide any evidence regarding how Student would be able to continue to participate in the general curriculum while at Heron Creek and/or Serendipity Center." Expedited Order at 41.

---

would cause injury to self or others, a school district could take no steps to minimize the risk of injury and seek placement of a student into an interim alternative educational setting for injurious behavior." Expedited Order at 40-41.

The Court agrees that such an inquiry is appropriate for two reasons. First, though the Ninth Circuit has not adopted the reasonable steps test, the plain meaning of 20 U.S.C. § 1412(5)(B)'s text requires some consideration of the supplementary aids and services that a school used to satisfactorily achieve education in the regular classroom before resorting to removal. Second, the text of both OAR 581-015-2430(1) and 20 U.S.C. § 1415(k)(3)(B)(ii)(II) demand it, as previously explained. Those provisions allow for the District to petition an ALJ for an IAES order for behavior substantially likely to result in injury to the child or others. There is no way to determine if a child's behavior is likely to cause such a result without accounting for the environment in which the behavior is occurring, including the extent to which school staff have attempted to mitigate those behaviors.

PAGE 27 – OPINION AND ORDER

In objecting to the ALJ's decision, the District argues that that it did, in fact, provide such evidence, pointing to Dr. Jill Bennett's hearing testimony. That testimony includes Dr. Bennett's description of Heron Creek as a "specialized school[]" that "provides really a comprehensive array of services for students who need more specialized assistance," addressing behavioral, mental health, social, emotional, and academic needs. Exp. Tr. at 43:5-12. It also includes her determination that Heron Creek was an appropriate placement for Student where Student would receive "more academic benefit." *Id*. at 105:8-11; 108:14-17. After reviewing the record below, the Court also finds material Dr. Bennett's testimony that Heron Creek is a locked down campus with secure entry that is ideal for students with elopement issues. *Id*. at 104:22-105:7. She acknowledged, however, that that she had never been to Heron Creek. *Id.* at 44:15-16.  Dr. Bennett's testimony included almost nothing about Serendipity Center, other than that it was similar to Heron Creek but privately owned. *Id.* at 45:9-12. Ms. Williams also discussed Heron Creek in her testimony, but similarly did not specifically address how the placement would allow Student to continue making progress towards Student's IEP goals.[15] Moreover, as the ALJ discussed in her Expedited Order, outside of Dr. Bennett and Ms. Williams' testimony and the Heron Creek handbook, there is little else in the record to show how the proposed IAES enables Student's continued participation in the general curriculum or progress towards achieving Student's IEP goals.

These largely generalized descriptions of Heron Creek—one of two placement options under consideration—are not enough to meet the requirements of OAR 581-015-2435(2). The District must show *specifically* how Student will be able to continue participation in the general

---

[15] At the later due process hearing, Ms. Williams also testified that Heron Creek's small class sizes, high adult-to-student ratio, and specialized instruction made it a good place for Student, and that she believed the school could implement Student's IEP. Tr. 106:13-107:14.

PAGE 28 – OPINION AND ORDER

curriculum and progress towards achieving Student's IEP goals, explaining the precise programming or other characteristics of the proposed IAES that meet the regulatory requirements. This standard is in keeping with the overall architecture of the IDEA, which is designed to ensure that educational agencies provide plans and services are "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F*, 580 U.S. at 399 (discussing the requirements of an IEP); *see also G.D. obo G.D. v. Utica Cmty. Schs.*, 2023 WL 2719426, at *5 (E.D. Mich. Mar. 30, 2023) (affirming ALJ's finding that placement in IAES violated IDEA because it did not provide the "services and support" sufficient to constitute a FAPE). Here, the District has wholly failed to specifically show how the proposed IAES would meet the regulatory requirements, and the Court thus affirms the ALJ's decision to deny the District's motion for an order to temporarily change Student's placement.

## C. ALJ's Final Order on Due Process Complaint

The District also appeals the ALJ's Final Order on the due process complaint. The District argues that the ALJ erred in reaching all five violations and in the remedy imposed. Each alleged error is addressed in turn.

### 1. Whether the December 2, 2024 MDR Required New Action by the District

The District raises several arguments against the violations found by the ALJ as a result of the December 2nd, 2024 MDR. The ALJ found that the District denied the Student a FAPE from December 2nd, 2024 to May 12th, 2025 "by failing to either conduct a functional behavior assessment or review the behavior support plan and modify as necessary to address student's unwanted behavior subsequent to the MDRs in violation of OAR 581-015-2415(4)(b)." Final Order at 87. The ALJ also stated that "Student's BSP was inappropriate and did not provide Student a FAPE starting on December 2, 2024." *Id.* at 96. The District argues that the ALJ

misapplied OAR 581-015-2415, failed to consider evidence that the District reviewed and updated Student's BSP in both February and March 2025, and improperly ordered a new FBA or review of the BSP without proper parameters.

### a. The ALJ properly applied OAR 581-015-2415

Oregon regulations require that "[w]ithin 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the school district must determine whether the child's behavior is a manifestation of the student's disability." OAR 581-015-2415(3).

> A disciplinary removal is considered a change in educational placement and the school district must follow special education due process procedures if:
>
> (a) The removal will be for more than 10 consecutive school days (e.g. expulsion); or
>
> (b) The child will be removed for more than 10 cumulative school days from their current educational placement in a school year, and those removals constitute a pattern under OAR 581-015-2410(2).

OAR 581-015-2415(1).

In finding a violation of this provision, the ALJ relied on 34 C.F.R. § 300.530(f) and OAR 581-015-2420.[16] Final Order at 108-10. These provisions explain how a school shall determine whether conduct is a "manifestation of the child's disability" and, if it is, what the school must do.

---

[16] OAR 581-015-2420 is substantively the same as 34 C.F.R. § 300.530(e), and thus the ALJ could have relied solely on the federal regulations. Similarly, OAR 581-015-2415(4) is substantially similar to 34 C.F.R. § 300.530(e). The ALJ invokes both of these provisions, which have the same requirements of what a district must do after a manifestation determination is made.

The District explains that, on December 2nd, Student had been suspended from school only six times that academic year, not ten, and thus its staff had been proactive in convening an MDR they were not yet legally required to conduct. The District argues that because the decision to convene the MDR was optional, the decision to carry out the substantive requirements attendant to an MDR was also optional. This included any obligation to review or modify an ineffective BSP. Indeed, the District states, the ALJ's Final Order "risks discouraging school districts from convening MDRs any earlier than legally required." Appellant's Brief at 20 (ECF 8).

This argument is unconvincing. As the Ninth Circuit has held on numerous occasions, school districts "must comply both procedurally *and* substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citing *Rowley*, 458 U.S. at 206-07) (emphasis added). The District is correct that they were not obligated to convene an MDR following the November 6th suspension (the focus of the December 2nd MDR). But after the IEP team convened the MDR and determined that Student's behavior on November 6th was a manifestation of Student's disability, the IEP team was obligated to fulfill the substantive requirements of OAR 581-015-2415(4)(b)(B): to "review the behavioral intervention plan and modify it, as necessary, to address the behavior." Indeed, there is no authority creating an exception to these requirements just because the school was not required to convene the underlying MDR in the first place. Recognizing such an exception here would undermine the substantive purpose and benefit of an MDR: the opportunity to create an effective plan to deal with behavioral issues determined to be a manifestation of a child's disability.

Additionally, as Student explains, the IDEA requires an MDR "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code

of student conduct." 34 C.F.R. § 300.530(e)(1). At the December 2nd meeting, District staff recommended changing Student's placement to an alternative school, and spent a substantial portion of the meeting discussing that recommendation. That is exactly the sort of change in placement that the law contemplates. Student argues that the December 2nd MDR was convened because the District had determined to make that change in placement recommendation, and thus the MDR was mandatory and not optional, regardless of how many suspensions Student had. If the December 2nd MDR had not been convened for that purpose, then after having made the decision to recommend that change in placement, the District would have been required to convene an MDR within 10 school days.

As for the District's argument that the ALJ's determination, and this Court's affirmation of it, will dissuade LEAs from convening MDRs earlier than required in the future, their argument appears to be that the Court must not enforce the IDEA's full substantive standard out of fear that school districts will hide from the facts that might trigger that standard rather than appropriately respond when such facts arise. There are two flaws in this argument.

First, the argument presupposes that schools regularly will encounter situations in which a student's conduct gives rise to a belief that an early MDR is needed, discover facts in that early MDR that would trigger a need for re-evaluation, and then not want to perform such evaluations. That hypothesis is too speculative to support a determination that an early MDR cannot trigger any subsequent substantive obligations. Further, the Court does not share the District's speculation because it has more faith in Oregon's educators. The Court declines to absolve the District of its obligations under the IDEA and Oregon law on the assumption that Oregon teachers and administrators generally seek to avoid doing their best for their students.

PAGE 32 – OPINION AND ORDER

Second, the Court sees in affirming the ALJ's decision no meaningful incentive to avoid scheduling early MDRs when they might be helpful in meeting a child's needs. That is because regardless of a school district's legal obligations under Oregon's regulations in such a situation, they remain beholden to the IDEA's broader requirement to amend IEPs when new information alerts them to the need for a change, as discussed below. Thus, school districts would be required to consider changes to an apparently ineffective BSP regardless of whether they convened an MDR.

The District further argues that the ALJ applied an inappropriately high legal standard in finding that it was required to revise student's BSP following the December 2nd MDR because "the ALJ's conclusions eliminate the MDR team's discretion in determining whether a revision to the BSP was necessary." Appellant's Brief, ECF 8 at 21. As the District accurately explains, if a Student's behavioral infraction is found to be a manifestation of Student's disability, and an FBA already exists, OAR 581-015-2415(4)(b)(B) and 34 C.F.R. § 300.530(f)(1)(ii) require the District only to "review the behavioral intervention plan and modify it, *as necessary*, to address the behavior" (emphasis added). The words "as necessary," the District contends, give the MDR team discretion to revise the BSP as it sees fit. They are correct, as far as it goes. Indeed, courts have held that the MDR team is required only to review the BSP under such circumstances, not necessarily change it. *See, e.g.*, *Farmer v. Union Cnty. Bd. of Educ.*, 2025 WL 209168, at *5 (W.D.N.C. Jan. 15, 2025) (holding that an LEA did not commit procedural error when, at an MDR, it reviewed a BSP and determined that revisions were inappropriate).

But while the District is right on the law, their argument assumes facts not reflected in the record. The District's own exhibits show that there was no serious discussion of whether the BSP needed to be changed at the December 2nd MDR. The meeting notes show that, after

PAGE 33 – OPINION AND ORDER

determining that Student's November 6th behavioral incident was a manifestation of Student's disability, the IEP team noted that "everything we are trying is not decreasing [Student's] behaviors." Ex. D26 at 1. There is no indication that there was any discussion of revisions that might be helpful, or even discussion ultimately resulting in a determination that revision was unnecessary or inappropriate. Instead, the notes reflect that almost all the discussion at the December 2nd MDR related to changing Student's placement to an alternative school. *Id.* The Manifestation Determination form also includes no record of any meaningful discussion of possible revisions to Student's BSP, though the District quickly followed the Manifestation Determination with a Prior Notice of Special Education Action proposing a change in Student's placement. *See* Ex. D25.

Testimony at the administrative hearing also showed the lack of meaningful discussion about whether changes to Student's BSP were necessary. Describing the meeting, Abby Williams stated that "[w]e reviewed the IEP and how [Student's] services were being met. We also talked about placement and possibly the need for a different placement." Tr. 108:5-8. She did not recall whether any changes were made to Student's services. *Id.* 108:17-19. Trevor Syring stated that the MDR included conversation about "what changes [d]o we need to make in order to best serve [Student]," but in continuing his description of the meeting, primarily discussed the conversation about a change in placement. *Id.* 340:19-341:24. Neither he nor Ms. Williams mentioned any other potential BSP changes raised at the MDR. Student's mother was blunt about the proceedings: "[T]hat entire meeting was geared towards them presenting data that would support them moving [Student]." Tr. 705:8-10. In short, there is no statutory or regulatory requirement that the District revise a BSP because they convened an MDR. But they *are* required to review it to determine if revisions are necessary, and that review must be more

PAGE 34 – OPINION AND ORDER

than perfunctory. It is not enough to repeat what services a student is receiving, state that those services are not working, and then proceed quickly to lengthy discussions of placement change. The administrative record indicates that is exactly what the District did.

Additionally, the IDEA levies more obligations on the District than just those associated with convening an MDR. The District is responsible for providing a FAPE to Student on an ongoing basis. That responsibility exists independent of the convening or results of an MDR. It includes an obligation to ensure that Student's IEP, inclusive of Student's BSP, is reasonably calculated to enable Student to make progress appropriate to Student's circumstances. *See, e.g.*, *Endrew F.*, 580 U.S. at 399. To meet that obligation, LEAs "[have] an affirmative duty to review and to revise, *at least* annually, an eligible child's IEP." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012) (citing 20 U.S.C. § 1414(d)(2)(A), (4)(A); 34 C.F.R. §§ 300.323(a), 300.324(b)(1)) (emphasis added); *see also D.H. v. Etiwanda Sch. Dist.*, 2014 WL 12852454, at *27 (C. D. Cal. Mar. 31, 2014) (finding that an LEA denied a FAPE when it relied on an outdated IEP). The statutory requirement to update an IEP *at least* annually suggests that there are circumstances in which schools should conduct such an update between the mandatory yearly deadlines. Courts have found that IEPs are outdated when they do not reflect current assessments of the child. *See, e.g. Amanda J.*, 267 F.3d at 881-82; *D.S. ex rel. Clarenore S. v. Dep't of Educ., Hawai'i*, 2013 WL 6047200, at *3, 5 (D. Haw. Nov. 14, 2013) (finding that where a school district developed IEPs but failed to "consider the most recent information available," "that [s]tudent was denied a FAPE"); *V.B. v. Monroe Bd. of Educ.*, 2026 WL 867184, at *13 (D. Conn. Mar. 30, 2026) (finding that where a school district obtains an evaluation "but fails to update the student's IEP to reflect that information or otherwise incorporate the evaluator's findings, the district denies the student a FAPE because the IEP is not based on current, accurate evaluative

data and does not address all of the student's identified needs"). Moreover, inherent in *Endrew F.*'s holding that an IEP be calibrated to the student's unique needs is a requirement that it be calibrated to meet the student's *current* needs. Otherwise, the IEP is not "reasonably calculated to remediate and, if appropriate, accommodate the child's disabilities so that the child can make progress in the general education curriculum." *See M.C.*, 858 F.3d at 1201 (quotation marks omitted). Thus, the District's continuous obligation to provide FAPE to Student included an obligation to update Student's IEP, including Student's BSP, when there was evidence that it was not working.

At the December 2nd MDR, District staff acknowledged that Student's BSP was not working. The record confirms their assessment. At best, Student's behavioral challenges throughout the first half of the 2024-25 school year had remained constant. At worst, they had increased. As the ALJ explained in her Final Order, there was more than enough evidence by December 2nd to show that the existing BSP was failing and that change was required if Student was to make any progress towards Student's IEP goals, access the general curriculum, or otherwise receive FAPE. But instead of choosing to consider meaningful revisions to an outdated BSP, including those that Student's mother ultimately suggested, the District focused on a change of placement.

### b. The ALJ did not fail to consider evidence of changes to Student's BSP in February and March 2025

The District further argues that the ALJ erred in her finding because she did not appropriately consider the changes that the District made to Student's BSP in February and March 2025. The ALJ did not ignore those changes. She found them, along with the District's other efforts to implement Student's BSP, to be substantively inadequate. *See* Final Order at 111.

PAGE 36 – OPINION AND ORDER

Additionally, the District contends that the ALJ violated the "Snapshot Rule," inappropriately judging the substantive validity of those changes through the benefit of hindsight. In the Ninth Circuit, courts do not consider the adequacy of IEP or MDR team decisions through hindsight. *See, e.g.*, *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). Rather, those decisions are judged based on their reasonableness at the time they were made. *Id*.

In the ALJ's brief discussion of the February and March changes to the BSP, she states that the February changes were "too little, too late," that Student's behaviors continued after the February changes, and that in March, the MDR team "failed to modify the BSP beyond adding a backpack check." Final Order at 111. This discussion is part of a longer narrative about Student's ongoing behavior after the December 2nd MDR and the District's ongoing failure to make any more than minor changes to the BSP intended to address those behaviors. Viewed in that context, the ALJ does not arrive at her conclusion that the February and March changes were substantively inadequate because, with the benefit of hindsight, it is clear they did not work. Rather, those conclusions were based on data that was readily available to the MDR team beginning December 2nd that showed the BSP to be dramatically ineffective and in need of fundamental reimagining—data that informed the District's own contemporaneous belief that the BSP was failing.

### c. The ALJ did not err in ordering a new FBA

The District also takes issue with the ALJ's decision to order a new comprehensive FBA, raising two primary arguments. First, it argues that the ALJ's Final Order included determinations that, as of the December 2nd MDR, the District was required *either* to formulate a new FBA *or* to review the existing BSP, but provided little analysis to distinguish when either

option should be selected. Relatedly, the District states, the ALJ did not identify how the existing FBA was deficient.[17] This argument is unconvincing.

The ALJ's primary finding was that as of December 2nd the existing BSP, informed by the original FBA, "was inappropriate and did not provide Student a FAPE." Final Order at 86; *see also id.* at 123 (explaining that as of December 2nd, "it should have become apparent to the District that the BSP needed to be modified," "the District violated the IDEA and denied Student a FAPE by failing to modify Student's BSP after December 2, 2024," and that the "BSP was no longer adequate" as of December 2nd). While the ALJ did not engage in substantial discussion on the problems with the FBA itself, the logic underpinning her remedy is clear. "If the District was unable to determine what additional interventions would be helpful for Student, it may have needed to have another individual conduct a second FBA, or otherwise sought outside support to modify Student's BSP." Final Order at 111. There is no indication that the District was ever able to determine additional helpful interventions within the confines of the existing FBA-backed BSP. Thus, it should have looked to conduct another FBA or to modify the BSP.

In considering Parent's request for a comprehensive, new FBA, the ALJ noted the District's failure to modify the BSP after it "reasonably should have been aware that the BSP was ineffective in addressing Student's unwanted and inappropriate behaviors," meaning December 2nd. Final Order at 134. The ALJ then discussed the District's several other failures. *Id.* Ultimately, the ALJ opted for the more comprehensive course of action. The resulting

---

[17] The District also points out that the ALJ explicitly found that Student's parent had failed to establish that the FBA was deficient at the time it was developed. *See* Final Order at 108. This argument, however, misses the point. The ALJ determined that under Oregon law and the IDEA, after the District became aware on December 2nd that the existing approach to managing Student's behavior, as codified in the existing FBA-backed BSP, was substantively deficient, the District was required to take action. That the FBA *originally* was not deficient says nothing about whether after December 2nd the District was required to *update* that FBA.

decision to order a new FBA was within her equitable powers. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009). Here, noting the careful and thorough nature of the Final Order, the Court defers to the ALJ's determination.

Second, the District argues that it was already in the process of hiring a mutually-agreeable independent evaluator, and that this should have obviated the need for the ALJ's order. It did not. The ALJ had the authority to order a mutually-agreeable evaluator regardless of any similar yet unfinished efforts by the District. The ALJ's remedy acts as a backstop to ensure that the evaluator is actually hired and that the selection process is a collaboration between the District and Student's parents. If the District is already in the process of complying with the ALJ's order, so much the better.

**2. Whether the District failed to provide a FAPE from March 3rd to May 12th due to missed SDI time**

The District argues that the ALJ made a second major mistake in her Final Order when she found that the District failed to provide SDI to Student between the dates of January 28, 2025, and May 12, 2025. Specifically, the District asserts that the ALJ miscalculated the number of times Student was suspended and failed to consider evidence that the District cured any alleged failure to provide SDI during disciplinary removals.

**a. The ALJ incorrectly calculated the number of Student's removals**

As previously discussed, an LEA may remove a student from the classroom for ten cumulative school days before it is considered a change in placement. OAR 581-015-2405. Under that ten day threshold, the LEA is not required to provide general or special education to the removed student during the period of removal. *Id*. Once the threshold is met, however, the LEA is required to provide the removed student with special services, including SDI, during any subsequent removals. OAR 581-015-2415. Suspensions of half a day or less count as a half-day

removal, while suspensions of more than half a day count as a full-day removal. OAR 581-015-2405(3).

The ALJ calculated that Student's tenth day of removal during the 2024-2025 school year was January 24, 2025. Final Order at 111. Thus, she determined that the District was required to provide SDI to Student beginning with Student's eleventh suspension on January 28, 2025. The District disputes as erroneous the ALJ's decision to count two days when Student spent an hour in the principal's office due to dysregulation, September 6 and 17, 2024, as half-day removals. The District provides no caselaw or other argument supporting their categorization of the two incidents, and asserts that they were not removals. With those two incidents not included in the calculation of Student's disciplinary removals, the District contends that Student's tenth suspension was January 28, 2025, and thus their obligation to provide SDI during removals did not mature until Student's alleged eleventh suspension on March 3, 2025. In Student's Response, Student argues that the calculation of suspensions is precisely the sort of factual determination on which the Court should show deference to the ALJ. At bottom, the disagreement is whether the District owes the Student SDI for a single additional day of removal.

Oregon regulations define a disciplinary removal as any "suspension, expulsion, or *other removal*," but excludes from the definition "In-school suspensions if the child continues to have access to the general curriculum and to special education and related services as described in the child's IEP, and continues to participate with children without disabilities to the extent they would in their current placement." OAR 581-015-2400(3) (emphasis added). While there is no apparent regulation or caselaw further defining a removal, the plain meaning of the term is "to change the location, position, station, or residence of." *Remove*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/remove (last visited July 2, 2026). Based on this

definition, Student's trips to the principal's office on September 6 and 17, 2025, certainly were removals. Thus, the question is whether those removals fell into the in-school suspension exception to OAR 581-015-2400(3). It does not appear so, because during the time that Student was in the principal's office, Student did not technically have access to the general curriculum.

But courts "should reject interpretations of statutes or regulations which 'produce an unjust, unreasonable, or absurd result.'" *Maceren v. Dist. Dir., Immigr. & Naturalization Serv., Los Angeles, Cal.*, 509 F.2d 934, 941 (9th Cir. 1974) (citing *In re Petition of Vacontios*, 155 F. Supp. 427, 430 (S.D.N.Y. 1957)); *see also Painter v. Atwood*, 912 F. Supp. 2d 962, 965 (D. Nev. 2012) ("It is well established maxim that statutes cannot be interpreted in such a way as to produce absurd results"); *Chowdhury v. Ashcroft*, 241 F.3d 848, 853 (7th Cir. 2001) (holding that regulations "should not be so strictly interpreted as to provide unreasonable, unfair, and absurd results"); *U.S. v. Cheek*, 586 F. Supp. 2d 1099, 1108 (D. Ariz. 2008) ("[U]nless such an interpretation leads to an absurd result, the plain meaning of a regulation controls the Court's interpretation of the regulation" (citing *U.S. v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004)). Here, a plain reading of the regulation produces just such an absurd result. While Student did not have immediate access to the general curriculum in the principal's office, Student *did* have access to the adult support that Student's IEP requires. Additionally, the entire point of sending Student to the principal's office during periods of dysregulation was to give Student the space needed to get Student under control and return to the classroom better able to engage with the general curriculum. To hold that such short trips to a school administrator constitute a disciplinary removal would create an unreasonable and unworkable standard for educators. Would a five-minute time-out in the hallway also count as a half-day disciplinary removal? A fifteen minute?

PAGE 41 – OPINION AND ORDER

Where is a logical delineation for schools to apply? Under a strict textual interpretation, possibly any length of "removal" would qualify.

Certainly, the Court can imagine the unlikely circumstance in which LEAs abuse such tools, sending students to an administrator for substantial portions of the school day with no intent to return them to the classroom, or repeatedly sending students to the principal's office in lieu of suspension to avoid the requirements of the IDEA. That does not, however, appear to be the case here. The Court agrees with the District's categorization of the incidents on September 6th and 17th. Neither were half-day disciplinary removals. Thus, Student's tenth removal was on January 28th, and the District's responsibility to provide SDI began with Student's eleventh removal on March 3rd.

### b. The ALJ did not fail to consider evidence that the District cured its failure to provide SDI

After a student has been removed from the classroom for ten days, an LEA is required to provide services during any subsequent disciplinary removal. OAR 581-015-2415. Failure to provide those services is a material failure to implement a child's IEP because it is substantially more than a minor discrepancy between the services required and those provided. *See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007).

It is undisputed that the District failed to provide services during Student's suspensions until April 23, 2025. The ALJ did, however, find that beginning on that date, the District began to provide a total of 420 minutes of make-up SDI time spread across eight dates, with Student refusing work on one of those dates. Final Order at 71; *see also* Ex. D102. This compensatory education, the District argues, cured its failure to earlier provide services during Student's disciplinary removals, which the ALJ did not consider in her determination that the District failed to provide a FAPE to Student.

PAGE 42 – OPINION AND ORDER

District's argument fails. The obligation to provide services during periods of removal over ten days is contemporaneous. *See* OAR 581-015-2410(3) (requiring that, "*[d]uring* removals," LEAs "must provide services that are necessary to enable the child: (A) To continue to participate in the general education curriculum, although in another setting; and (B) To progress toward meeting the goals in the child's IEP" (emphasis added)); 34 C.F.R. § 300.530(b)(2) ("After a child with a disability has been removed from his or her current placement for 10 school days in the same school year, *during* any subsequent days of removal the public agency must provide services" (emphasis added)). Thus, a failure to provide services at the time of the removal is a failure to provide a FAPE, regardless of the efforts an LEA may later make.

The provision of compensatory education is not meaningless; however, the District misplaces it in the analysis. The make-up SDI does not cure their failure to provide a FAPE. Rather, compensatory education is an equitable remedy within the discretion of the Court for such failure. *See, e.g.*, *Hood River Cnty. Sch. Dist. v. Student*, 2021 WL 2711986, at *19-21 (D. Or. July 1, 2021). Thus, while the Court will consider the District's efforts to provide belated SDI when reviewing remedy, it does not find that such efforts cured an IDEA violation that all parties agree occurred.

### 3. Whether the District failed to provide a FAPE after removing Student from classroom for more than ten days

The District also argues that the ALJ erred in finding that the District denied Student FAPE by imposing more than ten cumulative days of disciplinary removals. As previously discussed, Oregon regulations explicitly allow LEAs to remove a child with a disability for more than ten cumulative days in a single school year provided the LEAs meet certain procedural and substantive requirements. *See* OAR 581-015-2415. Consequently, if the ALJ actually had found

that disciplinary removals of more than ten cumulative days were a *per se* denial of a FAPE, that finding would have been clearly erroneous.

That, however, is not what the ALJ found. Rather, the ALJ determined that the District had suspended Student for more than ten cumulative days and that the suspensions constituted a pattern,[18] constituting a change in placement, without meeting the regulatory requirements such a change triggered. Specifically, as already discussed, she found that the District "failed to treat the exclusions as a change in placement. [It] did not conduct a new FBA, update the BSP, or return Student to Student's placement. Additionally, [it] did not provide Student with required educational services during the disciplinary removals." Final Order at 116. These actions were all required. *See* OAR 581-015-2415(4); OAR 581-015-2435. The District suggests that it had met the relevant procedural requirements by convening MDRs. But as should be clear at this point, it failed to follow through on other requirements triggered by a change in placement.

4. **Whether the District failed to provide a FAPE when it changed Student's placement to a therapeutic day school**

The District challenges the ALJ's conclusion that it violated the IDEA and denied Student a FAPE when, in March 2025, it changed student's placement to a therapeutic day school instead of considering additional supports and services to maintain Student in the LRE. In support of this challenge, the District makes two primary arguments. First, that the ALJ's conclusion ran contrary to law and facts. Second, that the ALJ failed to apply the *Rachel H.* factors.[19] The District bears the burden of overcoming the presumption in favor of the general

---

[18] Notably, in finding that the removals constituted a pattern, the ALJ relied on the District's own determinations from the MDRs it convened. In each one, the MDR team determined that Student's behavior was a pattern.

[19] These factors arise from *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. ex rel. Holland*, 14 F.3d 1398 (9th Cir. 1994).

education setting and justifying its proposed placement change. *See Oberti by Oberti v. Bd. of Educ.*, 801 F. Supp. 1392, 1401-02 (D.N.J. 1992), *aff'd* 995 F.2d 1204 (3d Cir. 1993) (citing *Davis v. Dist. of Columbia Bd. of Educ.*, 530 F. Supp. 1209, 1211-12 (D.D.C. 1982)).

### a. Facts and the law supported the ALJ's conclusion that the District failed to provide a FAPE

Fundamentally, the ALJ determined that the therapeutic school placement was a denial of a FAPE because it unnecessarily deprived Student of the benefit of the LRE. The record, she found, "demonstrates that the District is unable, with the current staff and BSP/IEP in place, to address Student's unwanted behavior. However, *the evidence does not show that Student cannot be adequately served in Student's neighborhood school*." Final Order at 123 (emphasis added). The ALJ stated that this was because the District, despite plenty of evidence showing that the existing BSP was failing, made very few changes. Notably, the District never engaged an outside expert (despite Student's mother's continual requests to do so) or reevaluated its responses to Student's behaviors. Because the District never had an effective BSP in place after December 2nd, it did not have the data adequate to assess whether Student could be adequately educated in the LRE rather than be placed in an alternative school.

The District contends that the ALJ's holding essentially is conclusion that the District had not fully exhausted attempts to implement a successful BSP. The District first argues that this is foreclosed by the Snapshot Rule, for the same reasons it previously argued. The Court has rejected that argument and for the same reasons rejects it here.

The District next argues that the ALJ's conclusions are based on a "faulty assumption" that a valid BSP will avoid a placement change and the validity of the BSP hinges on whether it is successful. The District notes that under the IDEA a BSP is a tool, and so is a change in placement. The ALJ, however, did not foreclose a change in placement or that a BSP could fail

PAGE 45 – OPINION AND ORDER

to address Student's behavior. The ALJ determined that under the circumstances of this case, the District did not do enough to *try* to create to a successful BSP before switching to the remedy of placement change.

Finally, the District argues that the ALJ's conclusion relies on the assumption that there was a BSP that could have been successful if only the District had continued to try additional supports and services. In the District's view, the ALJ's ruling required an unending effort to throw more and more resources at a challenge they had already shown they were incapable of resolving. They argue that a more appropriate course of action now is to escalate to a therapeutic school. [20]

This argument misunderstands the ALJ's findings and conclusions. The ALJ explained that at several key junctures, and on an ongoing basis after the December 2nd MDR, the District

---

[20] In explaining its position, the District offers an analogy, comparing the process implementing a BSP for a disabled child to that of treating a severe illness. In this analogy, if a doctor proceeded to a more drastic course of treatment—like surgery—after a less drastic course of action—like chemotherapy—failed, the failure would not necessarily be evidence that the less invasive treatment was faulty, ill-conceived, or improperly administered. Similarly, the District reasons, it is not automatically true that the District's less restrictive approaches to supporting Student (via multiple revisions of the FBA-informed BSP) were erroneously designed or improperly implemented just because they ultimately failed. To the District, that failure should be a signal that more restrictive approaches are called for rather than an opportunity to rethink the less restrictive approach.

The analogy is well-taken, but incomplete. In this case, the record reflects failures both of prescription *and* diagnosis. The District is correct that the doctor in their analogy could not be faulted if she correctly diagnosed a patient with cancer and prudently pursued a minimally invasive treatment plan before escalating to a risky surgery as a last resort. But she could be faulted for continuing a treatment plan for cancer when subsequent data suggested that the patient actually had heart disease. She also could be faulted for pursuing an aggressive form of treatment when other, less invasive but possibly effective prescriptions remained available, if only she would take the time to research them. Doctors regularly try different courses of conservative treatment before moving to something more drastic. Similarly, here the ALJ is requiring the District to reconsider their diagnosis (with a new FBA) and prescription (with a new BSP) and gather better data, thus allowing for an informed placement decision.

PAGE 46 – OPINION AND ORDER

had a sufficient and growing body of evidence at its disposal to understand that its fundamental response to Student's behavior was not working, and that a new approach was necessary. Indeed, there was good reason to believe that the Student's original BSP and the changes later implemented actually exacerbated Student's behavioral challenges. They did this by allowing Student to avoid all or nearly all academic work and then using exclusionary disciplinary practices that completely removed Student from the learning environment—essentially rewarding Student for bad behavior by allowing Student to do what Student wanted: stop working and go home. The ALJ concluded that after the District became aware of the deficiencies in its BSP on December 2nd, it did not meaningfully make changes tied to Student's functions and thus the District needed to make one effort to develop a BSP that was "grounded in adequate data regarding the antecedents and functions of Student's unwanted behaviors, and scientifically backed responses to that behavior." Final Order at 123. No minor changes or additions to Student's roster of supports were ever going to meet Student's needs if not calibrated to address those functions. The ALJ thus was not erroneous in finding the BSP to be inappropriate and the placement change an inappropriate retreat from the LRE and denial of a FAPE.

Similarly, the ALJ made no assumptions about how successful a new FBA or fundamentally revised BSP would be. Rather, she insisted that the District take the time to develop an appropriate BSP and gather data based on that BSP before determining whether a therapeutic school was appropriate. That was because the District could not accurately make such a determination without quality data measuring the success of a BSP with supports and services that addressed Student's functions is not requiring the District explore "every conceivable intervention or service." Appellant's Reply at 23 (ECF 12).

PAGE 47 – OPINION AND ORDER

### b. The *Rachel H.* factors support keeping Student in Student's current placement

The IDEA establishes that "[t]o the maximum extent appropriate," a child is not to be removed "from the regular educational environment" unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). States must adopt policies in conformance with this provision. *Id.* § 1412(a)(5)(B).[21] The Ninth Circuit has determined that "this provision sets forth Congress's preference for educating children with disabilities in regular classrooms with their peers." *Rachel H.*, 14 F.3d at 1403. Thus, there is a presumption for "mainstreaming," but the District can overcome that presumption by proving "that its proposed placement provided mainstreaming to 'the maximum extent appropriate.'" *Id.*

The Ninth Circuit adopted a four-factor balancing test to show whether a student's placement is in compliance with the IDEA. *Id.* at 1404. To determine whether an LEA's placement of a disabled student meets the requirements of the IDEA, the Ninth Circuit requires lower courts to balance: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [the student]."

The District argues that, though the ALJ cited *Rachel H.*, she ultimately did not apply the factors to Student's current placement. Student responds that the ALJ "engaged with each of [the *Rachel H.*] considerations," and characterizes the District's argument merely as a complaint that the ALJ weighed the factors differently than the District would have liked. Appellee's Response at 42 (ECF 10). Here, both parties are at least partially correct. Taking the Final Order in whole,

---

[21] Oregon's LRE regulations are set forth in OAR 581-015-2240 to 581-015-2255.

it is clear that the ALJ did, in fact, engage with all four of the factors. But *Rachel H.* requires more than engagement. It requires balancing, which necessitates considering the factors together and weighing them against each other. This, the ALJ did not do. Her analysis of the factors amounts to one citation of the case. Beyond that, the relevant analysis is scattered throughout the Final Order.

This shortcoming is not dispositive. Rather, it is this Court's application of the factors that matter. First, the record overwhelmingly supports the conclusion that Student is receiving little to no educational benefit in Student's current placement. Throughout the year, Student spent less and less time in the general education classroom, and Student's teachers expressed concern that despite beginning the year cognitively on grade level, Student's academic progress was regressing. Importantly, though, this academic backsliding indisputably was the result of Student's behavioral issues, themselves the product of an ineffective BSP. It is entirely possible that an effective BSP would allow Student to access the benefits of the general education classroom. Thus, the Court finds that the first factor is neutral.

Second, Student is deriving nonacademic benefit from Student's current placement. The record shows that Student has developed important relationships with some of Student's teachers and paraeducators, especially Mr. Gilstad, despite Student's behavioral issues. Additionally, some testimony and exhibits indicated that Student has made some friends at Student's current school even though Student generally has trouble doing so. *See, e.g.*, Tr. 242:1-3 ("With him, I would give a few more choices, saying your friends are doing a lot of fun activities…."); Tr. 694:19-20 ("[Student] wants to be around with [Student's] friends."); Ex. D91 at 10 ("When [Student] perceives that a friend has been treated unfairly, [Student] typically will want them to pay a consequence for how they treated [Student's] friend."). Additionally, Student's current

PAGE 49 – OPINION AND ORDER

placement keeps Student close to home, and thus close to the quick support of family, and in the same school complex with Student's siblings. The second factor therefore weighs in favor of keeping Student in place.

Third, Student's effect on teachers and students in the regular classroom is clearly deleterious. The record shows that Student engaged in acts of physical aggression against staff and peers hundreds of times over the course of the school year, and that Student's outbursts routinely disrupted s classmates' learning. The third factor weighs against keeping Student in the general education environment.

Finally, both parties agree that resourcing was not the primary hurdle to keeping Student in place. By the time an alternative placement was on the table, the District had already committed to providing adult support to Student for the entire school day. To facilitate remaining in the LRE, the District almost certainly would need to consult a BCBA, conduct a new FBA, and draft a new BSP, but these one-time costs are limited. Thus, the final factor weighs in favor of keeping Student in place.

Taken together, the *Rachel H.* factors do not resoundingly support or reject a particular placement, though they tip in favor of keeping student in the general education classroom. Because the burden is on the District to overcome the presumption associated with educating Student in the LRE, the *Rachel H.* factors do not ultimately rescue the District's decision to change Student's placement from the ALJ's determination that such a change constitutes, at this juncture, a denial of a FAPE.

### 5. The ALJ's proposed remedy is appropriate

Under the IDEA, U.S. District Courts and ALJs have broad equitable powers to remedy the failure of an LEA to provide a FAPE to its students. *See, e.g.*, *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985); *Forest Grove Sch. Dist.*, 557 U.S. at 230; *M.B. v.*

PAGE 50 – OPINION AND ORDER

*Springfield Sch. Dist. No. 19*, 2020 WL 5653986, at *15 (D. Or. Sept. 23, 2020). Here, the ALJ ordered three categories of relief: (1) 200 hours of compensatory education, (2) a facilitated IEP, and (3) a new, comprehensive FBA conducted by an independent behavioral specialist, followed by a new BSP.

The District objects to the ALJ's requirement that the District provide Student with 200 hours of compensatory education. The District argues that in crafting this remedy, the ALJ did not consider the District's procedural compliance but instead evaluated Student's progress compared to Student's peers, thereby applying a standard more akin to those for § 504. *See* 29 U.S.C. § 794. Additionally, the District argues that the ALJ's conclusions with respect to the compensatory education remedy are internally inconsistent. Neither of these arguments are availing.

First, in support of its argument that the ALJ improperly based her decision on a comparison between Student and Student's peers, the District cites to a single sentence in a 138 page order which reads: "Despite starting Student's kindergarten year at the same level academically as Student's peers, Student made no meaningful progress." Final Order at 112. That sentence does not make clear that the ALJ relied on differences between Student's performance and that of Student's peers to justify compensatory education. Had she intended to do so, she would have included information describing not just where Student's classmates started the year, but where they finished, so as to show their relative progress. She does not do that. Contextualizing the sentence further confirms that the ALJ relied primarily on Student's own academic performance. The reference to Student's peers was merely a marker to explain *Student's* starting point. She then notes *Student's* ending point, as showing no meaningful

PAGE 51 – OPINION AND ORDER

progress. The rest of the section focuses entirely on Student's academic regression over the course of the period at issue, with no mention of Student's classmates at all.[22]

Second, the primary internal inconsistency that the District identifies in the ALJ's Final Order is the fact that she found compensatory education necessary despite finding that all IEPs adopted over the course of the year were "reasonably calculated to confer the Student a meaningful bene[fi]t." Appellant's Brief at 51. The ALJ's conclusion, however, is not so broad with respect to the IEPs after December 2nd. After that date, the ALJ rejected the *specific deficiencies* alleged by Parent in the complaint against the District, but in doing so repeatedly emphasized that the District "should have taken steps to find new interventions for Student's unwanted behaviors" and similar text. *See, e.g.*, Final Order at 102-03. The ALJ rejected only that "the failure to provide *these specific interventions* resulted in a violation of the IDEA or a denial of FAPE." *Id.* (emphasis added).

Additionally, in her Order the ALJ does not base her provision of compensatory education on the conclusion that Student's IEPs were inappropriate as written. Rather, she roots that decision in the narrower violation of an inadequate FBA and BSP. As Student correctly argues in the Response, a substantively adequate IEP can still result in a denial of a FAPE if its associated BSP is so deficient that it prevents access to instruction, and thus the IEP's benefits.

---

[22] Importantly, none of this discussion is in the Remedies section of the Order. In that section, where the ALJ details her procedure for calculating hours of compensatory education, it is clear that the factors material to her calculation have nothing to do with Student's academic performance relative to Student's peers.

Additionally, as discussed previously in this Opinion and Order, the District's decision to proactively provide 420 minutes (7 hours) of make-up SDI may be a mitigating factor in calculating remedy. However, given that the ALJ's calculation of compensatory education already substantially underestimates the educational benefit lost to Student through Student's removals, the Court declines to adjust downward the total of 200 hours.

The Court thus finds that the ALJ's prescribed remedies are appropriate and justified by both fact and law.

## CONCLUSION

The Court reverses the ALJ's determination that the District constructively changed Student's placement as of January 24, 2025, and finds instead that the change of placement occurred on January 28, 2025. The Court affirms the remainder of the ALJ's findings and conclusions, as well as the ordered remedies.

**IT IS SO ORDERED**.

DATED this 12th day of August, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 53 – OPINION AND ORDER